DOMENGEAUX, Judge.
This is a suit by the holder of a promissory note, secured by a crop pledge, to recover the principal, interest, and attorney’s fees due on the note. After a trial on the merits, judgment was rendered in favor of the plaintiff in the amount of $8,936.24, (the principal amount of the note) together with legal interest from date of judicial demand. Defendant-appellant, American Grain Association, appealed said judgment and plaintiff-appellee, Top Crop Seed and Supply Company, answered the appeal seeking an amendment of the judgment to allow interest of 8% (from October 20, 1970) and 10% attorney’s fees, allegedly due in accordance with the terms of the note.
The facts are that on April 8, 1970, Hugh R. McMillin, Jr., a rice and soybean farmer, granted a chattel mortgage and crop pledge to the United States of America, acting through the Farmers Home Administration (hereinafter referred to as “F.H.A.”) in the principal sum of $25,600.-00 affecting crops to be grown on certain property situated in Jefferson Davis Parish. This instrument was filed in the appropriate records on April 8, 1970, and advances to McMillin were subsequently made in the principal amount represented thereon.[1]
During the period commencing March 27, 1970, and ending July 16, 1970, Mc-Millin purchased seed, fertilizers, and sup *807 plies from the plaintiff- — Top Crop Seed & Supply Co. (hereinafter referred to as Top Crop) for the growing of both rice and soybeans during the 1970 crop year. Thereafter on October 20, 1970, McMillin granted a note in favor of Top Crop in the amount of $8,936.24 (representing the previously mentioned purchases) which was also secured by a crop pledge on the same property described in the pledge to F.H.A. This latter lien was recorded on October 21, 1970.
Beginning on October 1, 1970, F.H.A. began to recieve payments on the debt owed it by McMillin from the proceeds of rice and bean sales. As was the custom in the business of crop lienholders, a portion of these payments were, however, often released back to McMillin to cover “harvest expenses”. In toto, F.H.A. applied $33,329.59 from those amounts collected on crop sales in 1970 to the McMillin indebtedness. The F.H.A. county supervisor for Jefferson Davis Parish, Lowell Moore, testified that of the aforementioned amount collected, a sum equal to the 1970 crop pledge for $25,600.00, plus some $500.00 (which was the total) interest, was applied first to that lien and the balance (about $7,200.00) of the funds were then applied to the prior year’s “carry over” debt owed by McMillin to F.H.A.
The defendant — American Grain Association, was the purchaser of McMillin’s 1970 soybean crop, for which it paid the total sum of $12,379.47. In consideration of each of the purchases, the defendant issued checks, on the dates and in the amounts as follows, made payable to Mc-Millin and F.H.A. as “first” lienholder. This was done despite the fact that American Grain was aware of the “second” pledge to Top Crop.
November 6, 1970 . $1,145.19
November 6, 1970 $ 305.08
November 11, 1970 $1,503.64
November 30, 1970 $6,383.48
November 30, 1970 $1,232.42
November 30, 1970 $1,809.66
Out of the first check of November 6th, in the amount of $1,145.19, $845.19 was applied to the reduction of F.H.A.’s loan, while $300.00 was released to McMillin as “harvest expenses”. The second check for $305.08, however, was simply endorsed over to McMillin without recourse. There is no evidence presented to indicate this latter sum was earmarked for “harvest expenses”.
The third check of November 11th, for $1,503.64, was entirely applied to the reduction of the F.H.A. loan.
The last three checks, all dated November 30th, and totalling $9,425.56, were also merely endorsed without recourse over to McMillin by F.H.A. and subsequently paid by the drawee bank.
McMillin, however, rather than applying the proceeds (from the checks endorsed over to him) to the Top Crop pledge, absconded with the funds. Top Crop received no payments on its promissory note secured by its “second” crop lien, despite the aforementioned knowledge on the part of the defendant that a “second” crop pledge existed.
On the other hand, Lowell Moore, as representative for F.H.A., testified that he did not know of Top Crop’s “second” crop lien when the agency endorsed the foregoing checks (not intended as “harvest expenses”, and totalling $9,725.64) without recourse over to McMillin. We take note of the fact, however, that as of November 6, 1970, F.H.A. released the $305.08 check, although a substantial amount still remained due on its $25,600.00 note. There is also testimony to the effect that the final payment on the F.H.A. crop lien note was not actually made until January 26, 1971 (after the release of the $9,425.56 in checks on November 30th). The only explanation for this statement is that the county supervisor might have miscomputed the interest due and accruing on the note and that subsequently same was paid when chattels belonging to McMillin were sold.
*808 Top Crop thereafter filed suit against American Grain Association and Hugh R. McMillin, Jr., seeking to recover the principal, interest, and attorney’s fees due on its $8,936.24 secured note. American Grain answered the suit, denying any liability to Top Crop, and filed third party demands against McMillin, F.H.A. and Lowell Moore, County Supervisor for F. H.A. Subsequently the action was removed by F.H.A. to a Federal District Court which remanded the matter on the basis of lack of jurisdiction. The state district court then dismissed suit against F.H.A., holding that a state court had no jurisdiction over a federal agency. Service was never made on Hugh R. McMillin, Jr. since his whereabouts are unknown. This controversy, for all practical purposes, is thus solely between the plaintiff, Top Crop, and American Grain Association.
Plaintiff bases its suit for recovery on the crop pledge statutes contained in LSA R.S. 9:4341 et seq. (specifically LSA R.S. 9:4341) [2] and the jurisprudence interpreting same. It is alleged that the defendant, American Grain, violated the provisions and intent of these statutes and is liable under the jurisprudence due to -the fact that it purchased the crops pledged by McMillin, remitting the proceeds to Mc-Millin and F.H.A., without the consent of the plaintiff as lienholder, and as a result of said acts that plaintiff has been deprived of- its pledge on the crop. It is strongly asserted that it is “absolutely imperative” that any proceeds disbursed by the purchaser had to go to the lienholder (s) before McMillin (the farmer herein) received any of the money, and that such burden (being absolute) is on the shoulders of the purchaser rather than the first lien-holder.
1 The statute, LSA R.S. 9:4341, provides:
“§ 4341. Pledge of crops; recording; rank
In addition to the privilege conferred by law, any planter or farmer may pledge or pawn any agricultural crop, either planted and growing or in contemplation of' being planted, in order to secure the payment for advances in money, goods, and necessary supplies that he has received, may receive concurrent therewith, or may thereafter require, in order to enable him to prepare the ground, plant and grow the crop, harvest or gather same, or otherwise in the production thereof, by entering into a written pledge of the crop or any portion thereof. The pledge shall secure no debt other than for money, goods, and necessary supplies for the production of the crop for the current year, and for having the pledge recorded in the office of the recorder of mortgages of the parish where the agricultural crop is to be produced, or is being produced. The recorded contract shall confer upon the merchant or other person advancing the money, goods, and necessary supplies for the production of said agricultural product, a right of pledge upon the crop, the same as if the crop had been in the possession of the pledgee, to take rank in accordance with date of filing same for record. The right of pledge thus conferred shall be subordinate to that of the claim of laborers for wages and for the rent upon the land upon which the crop is being produced.”
The plaintiff also points to the holding in Alexandria Production Credit Association v. Horn et al., 199 So. 430 (La.App. 2nd Cir. 1940), cert. denied January 6, 1941.
Therein the plaintiff held a recorded crop pledge to secure an advance of money and supplies to a farmer for planting and cultivation of his cotton crop. A creditor of the farmer was shipped the baled cotton and subsequently sold the crop, crediting the account of the farmer, all done without the actual knowledge by the creditor of the *809 recorded crop pledge. The plaintiff pledgee sued both the farmer and creditor seeking to hold them liable in solido on grounds that the registry of the crop pledge was constructive notice to all third parties. The court granted judgment in favor of the plaintiff, holding that recor-dation of a .crop pledge is constructive notice of a pledgor’s possession of the crop or trustee for the pledgee, and a third person who receives the pledged crop from the pledgor and sells it is personally liable with the pledgor — farmer as a joint tort feasor. See also LSA C.C. 3173, Soileau v. Gibbs, 229 La. 976, 87 So.2d 312 (1956); City Bank and Trust Co. v. Marksville Elevator Co., 221 So.2d 853 (La.App. 3rd Cir. 1969); Note Privileges — Crop Liens & Pledges — Recordation—Liability of Purchases, 15 Tul.L.Rev. 484 (1941).
The trial judge herein held that there was no question but that American Grain was liable to Top Crop by virtue of its purchase of crops grown on land subject to Top Crop’s pledge (which it was aware of) and the failure of defendant to discharge its obligation to Top Crop, as crop pledgee.
Defendant-appellant, however, argues that it cannot be liable to the plaintiff because Top Crop was the “second” pledgee and that as a result, its pledge never came into effect until the first pledge was satisfied or paid on January 26, 1971. Its basis for such an argument is Civil Code Art. 3152 holding that a creditor must be put into possession for the pledge to be valid.
We opine that this argument fails to recognize not only the cited fact that “possession” under a crop pledge is fictitious by its very nature, but also the fact that no distinction is made either in the Civil Code, the pertinent statutes, or the jurisprudence between a first and second crop pledge, insofar as protection is afforded. Neither do we find reason for any such distinction. In fact, a close reading of the language of LSA R.S. 9:4341 indicates to this court [specifically: . . . The recorded contract shall confer ... a right of pledge ... to take rank in accordance with date of filing . . . (emphasis added)] that the redactors themselves foresaw the possibility of more than one crop pledge on the same crop.
The trial judge also pointed out in his well written opinion that “The liability of American Grain could easily have been prevented if it had taken measures to insure that the farmer could not have been paid until the Top Crop debt had been satisfied. This could have 'been done by making the purchase checks payable to the farmer and all lienholders”. We agree with this conclusion.
American Grain, however, cites a number of reasons why this administrative measure would be bad practice. The trial judge cites each of these arguments and appropriately answers them. We adopt his reasoning and quote in pertinent part:
“First, inconvenience to the farmer would result because he would be required to travel to several places to obtain endorsements. This court agrees with the plaintiff in this matter, that any ‘ “inconvenience” occasioned to the farmer would certainly be secondary to the assurance that a second lienholder would be paid for the supplies that enabled the farmer to complete his crop in the first place.’ Further, this ‘convenience’ would be secondary to the assurance that the purchaser would not be liable to a lien-holder for purchase of crops subject to that lien.
“Second, the defendant contends that the requirement of multiple endorsements would not guarantee payment to inferior lienholders. While it is true that the payment to inferior lienholders is not guaranteed, the inferior lienholder would have to be satisfied with the accounting given by the superior lienhold-ers as to distribution of the funds before it would endorse the purchase money checks. If the inferior lienholder merely *810 endorsed without an accounting agreement, it would have only itself to blame. However, if an accounting agreement was made before endorsement, and the superior lienholder did not honor this agreement, the action would be against the superior lienholder. In either case, the purchaser could not be held liable if the inferior lienholder was not paid.
“Third, the defendant contends that an inferior lienholder would be placed in the position, by its prior endorsement, of warranting the payment of the checks, although no consideration was received by them.[3]
“Finally, the defendant asserts that an inferior lienholder might refuse to endorse the check because he would receive no proceeds, and, therefore, the check would be impossible to negotiate. If this possible, but highly improbable, event occurred, the superior lienholders would have an action to be paid the money owed them. In any event, the purchaser would not be liable for anything except the money he paid for the crop purchase.
“Also, the defendant assumed the risk by its failure to name' all lienholders as payees of its checks.” (Footnote added)
The remaining question then is the amount of liability.
According to City Bank and Trust Company v. Marksville Elevator Co., supra, “.. . . the immediate purchaser of a crop subject to it (a crop pledge) buys with constructive notice of the pledge and is personally liable to the crop pledgee, at least up to the value of the crop purchased by him.”
American Grain alleges, however, that it total possible liability ($12,379.47—the value of the crop purchased) should be reduced.
As initially contended, we agree that American Grain should not be liable for the amounts paid to F.H.A. (as the first and superior lienholder) and thereafter applied toward the note secured by the crop lien, since Top Crop as inferior lien-holder obviously had no claim to this purchase money. This includes the aforementioned checks of $1,145.19 (received on November 9) and $1,503.64 (received on November 20).
Defendant-appellant further contends that it should not be liable for the purchase price of soybeans represented by the $305.08 check received by F.H.A. on November 9th and endorsed without recourse over to McMillin. We also agree with this contention inasmuch as there was still a substantial balance due to the superi- or lienholder at that time and there is nothing in the record to indicate that this was released for “harvest expenses”.
It is next urged that because the defendant'—Association purchased only soybeans, its liability should be reduced pro rata by the amount of money owed for supplies which were used for crops other than soybeans. The trial court found this point to be res nova and stated:
“ . . . this court is of the opinion that a reduction in liability on these grounds should be disallowed for two reasons: First, the statute involved, R.S. 9:4341, contemplates that a crop pledge secures all of the crops grown on the property described in the pledge. Secondly, if this court allowed this reduction in liability, a second crop pledge might mean absolutely nothing.
For example, suppose a farmer grew two crops, soybeans and rice, as the farmer did in this case, and he signed two crop pledges, one for money and one for supplies that were used for his rice crop only. Later, when the rice was harvested first, the entire proceeds of the rice crop went to pay off the debt secured by the first crop pledge. The *811 second pledgee who had furnished supplies for only the rice crop would have no crop securing his debt, even though there were plenty of soybeans left to be sold from that same land upon which he had a crop pledge because he had supplied nothing for the soybeans.”
Finally, it is pointed out that F.H. A. actually retained $33,329.59 from the 1970 crop sales, although it only loaned $25,600.00, at 3% per annum interest, on the crop lien, the difference being used to satisfy other accounts. Therefore it. is argued that Top Crop had the right to recover this difference from F.H.A. and that as a result American Grain should be given credit for this amount used to satisfy indebtednesses not secured by the crop pledge. The fact remains, however, that if American Grain had made the checks payable to Top Crop, as well as F.H.A. and McMillin, the excess after the $25,600.00 crop lien had been satisfied would have then been sent by F.H.A. to Top Crop (rather than being applied to a prior debt). This is the uncontroverted testimony of the F.H.A. representative. We do not see how the defendant-appellant can now say that by reason of its own nonprudent actions that it should be given credit against a possible claim against F.H.A., which is not a party herein.[4]
As indicated by the trial judge, even with allowing the aforementioned reductions in American Grain’s possible liability, there was still, however, enough of the purchase money ($9,425.56) paid for the soybeans on November 30, 1970, to completely pay the $8,936.24 debt owed to Top Crop, if American Grain had properly discharged its obligation to Top Crop as “second” crop pledgee. Accordingly, we find no error on the part of the trial judge in awarding the plaintiff the sum of $8,936.-24.
The only remaining issue is that of plaintiff’s claim that it should be granted 8% per annum interest from October 20, 1970, on the note’s $8,936.24 principal as well as 10% attorney’s fees upon the unpaid principal and interest. We opine such argument has merit. The note specifically provides for interest to be awarded if the note is overdue and attorney’s fees if the note has to be placed in the hands of an attorney for collection. Both facts are present herein. See: City Bank and Trust Co. v. Marksville Elevator Co., supra.
However, if we were to award the full interest plus attorney’s fees (in addition to the $8,936.24 note principal) this would bring the judgment to an amount in excess of the entire purchase by the defendant from McMillin. In addition, as aforementioned, plaintiff’s initial total possible liability ($12,379.47) should have been reduced by $2,953.91 [the two checks — $1,-145.19 and $1,503.64 — actually applied to F.H.A. secured note and the $305.08 check endorsed without recourse over to Mc-Millin], leaving $9,425.56 (the total amount of the last three checks issued by defendant on November 30, 1970). We therefore limit the award against defendant — American Grain to $9,425.56.
For the above and foregoing reasons the district court judgment is affirmed insofar as it granted the plaintiff $8,936.24. The judgment is, however, amended to include interest and attorney’s fees as provided in the note sued upon (the total award, however, being limited to the value of the crop purchased less certain aforementioned reductions in plaintiffs possible liability) and it is hereby ordered, adjudged, and decreed that there be judgment in favor of the plaintiff, and against American Grain Association in the total sum of $9,425.56, plus legal interest from date of judicial demand until paid. The defendant-appellant is to pay all costs of the trial court and of this appeal.
Affirmed as amended.

. McMillin was also indebted to B'.H.A. for the 1969 crop year, which amount was carried over on the agency’s records.

. LSA R.S. 9:4381-2 also provides criminal penalties for the crop pledgor -who sells and the purchaser of the pledged crop who buys same with intent to deprive the pledgee of his pledge unless the latter gives his written consent to such disposal of said crops.

. As pointed out in the brief on behalf of ^aintiff-appellee, the inferior lienholder only need endorse the cheek “without recourse” to be protected.

. We express no opinion on the question of whether American Grain might have a claim against F.H.A.